All right, and now we will hear Bethpage. Thank you, Your Honor. May it please the Court, Alani Gilansky for Bethpage Water District. There is no dispute that this appeal is here for de novo review. There is also no dispute that the governing New York statute in this case is 214C, statute of limitations. Is there a dispute as to whether there are disputed facts? I think I hear that the brief says that the facts are undisputed. Your Honor, the funny thing is that there were not disputed facts until essentially this appeal and possibly until the magistrate judge's decision. Until that point, there was no dispute, and the magistrate judge's decision or recommendation assumes that there was no ---- The brief says at page 2 the principal facts are largely not in dispute. Yes, and we had the appellant's brief, and it wasn't until the Northrop Grumman's brief that they appeared to dispute whether there was any actual contamination, actionable contamination prior to the three-year period. During the entire motion practice, there was no dispute about that, but now in the appeal they've toggled between two views, one that there was actual contamination from the actionable plume prior to the three-year period or that there was no actionable contamination but that there's this reasonable water provider standard that applies. Both positions are the first one is factually without basis. The second one is legally incorrect. There is no dispute. There was a plume, right? Of course there was a plume. There was a plume identified in 2005. Can you say that it wasn't identified as actually going into wells 4-1 and 4-2 before 2009? No, Your Honor. It was not identified as touching or impacting the wells at any time prior to November 2010, and the first ---- to groundwater contamination. It wasn't in the wells yet, but it was approaching the wells. Is that disputed? It's not disputed that there was a plume out there traveling at the rate of 200 feet per year, and that's in the appendix at 1171. That's the Department of Interior's migration level. And there's no dispute that after having experienced contamination from another non-actionable plume covered by the tolling agreement for decades that Bethpage Water District was extremely concerned about this new plume discovered and released from the Grumman facilities about a mile and a half away, traveling at possibly 200 feet per year. And there was no dispute that at the levels at which that plume contained contaminants, there had to be new water filtration and treatment systems constructed well in advance of any actual contamination by the new plume. And so Bethpage did everything in its power to urge the DEC, Northrop Grumman, and the town to take action. Bethpage took Well 42 offline in December of 2009, right? It's my understanding that they took it off. They may have taken it offline not because of anything concerning the OU3 plume, but because of radium issues. And the town of Oyster Bay authorized a $14 million bond issuance? Oh, of course. And that was a reasonable – It seems that there were a lot of things happening that caused the water district to have noticed that they'd had to do something pretty drastic. It declared a state of emergency at some point, didn't it? Yes, it was an emergency. And all of these things happened before November of 2010? Well, Northrop Grumman at the same time. These things that I just mentioned happened before November of 2010? Oh, yes. Yes. Why wasn't that enough to put you on notice that you had a cause of action for a nuisance? There was no cause of action at that time because – Why not? Why couldn't you have sued Northrop Grumman at that time? That's what you worry about with statute of limitations is that one of the considerations is, was there enough of a cause of action to file a lawsuit in 2007, 2009, 2010? Could you in good faith have sued Northrop Grumman for this plume that was going into the two wells at four? Possibly for future injury. Possibly for that, but not for any actual injury. And in any event, it's clear under New York law that there was no accrual. Even if the plaintiff – Can we just explore that a second? I'm sorry? Why are you saying you weren't injured in November 2010? Wasn't it already in your capture zone? The idea of the capture zone is a term that's used interpretively. In some cases, capture zone means something close. In other cases, as in the Plainview decision, it's something that reaches all the way to the North Pole. All right. Well, let's talk about a realistic capture zone, the kind that's often specifically calculated. This was not calculated. Wasn't it eventually calculated by DEC? Not prior to November 2010. There was no calculation. Fine. I'm asking you, wasn't it calculated by DEC? There is such a thing that can be calculated. I'm not aware of a calculation of the capture zone by DEC. Okay. I might be overlooking it, but I'm not aware of that. Okay. So nobody ever knew what the size of the capture zone was. That's what you're saying? Nobody – there's no evidence of that in the record, no. There's a – Okay. There's a statement by the engineer, and you're arguing that his description of capture zone isn't really a description of capture zone, right? That's your argument? I know that the Bethpage engineer uses the term capture zone, but there's no description of what that is. And there's no indication that – I think there's a common sense meaning of it that when you have a well, you have a tube, right, and it's drawing water, it causes the capture zone to descend, I guess, or the water level to descend because the water from the aquifer is being captured to be pumped up in the well, right? Or is that wrong? Eventually. It's water that will eventually go into the well. There's no imminence in the sense of actual, immediate, about to happen. In MTBE, in this Court's decision in MTBE, and in MTBE-9, which this Court, I believe – In MTBE, the jury charge asked the jury whether the contaminants of a certain level were in the capture zone. Yes. And as I recall, the Second Circuit didn't say that was the wrong question. No, it was right because MTBE-9 says, and I quote, it's in the capture zone if the wells were turned on, the combined outflow of the wells would contain an injurious level of MTBE. That's exactly what we don't have here. There is no evidence whatsoever that once the wells at Plant 4 were turned on, the outflow would contain any contaminant from OU3. That's the essential distinction between the capture zone used by the engineer in this case and the capture zone used in MTBE-9. The capture zone is an entirely interpretive concept that is used without regularity and without consistency in the hydrogeologic literature. What I'm hearing is there's a factual issue. Yes, there's a factual issue, and as in MTBE, this issue should go to the jury. And weren't you supposed to say there was an issue of material fact that was in dispute? Well, that was stated in the 56.1, but based on the decisions below, there wasn't really a factual dispute that there was this threat. The magistrate judge did not say anything about an actual contamination, did not rely on an actual contamination. The magistrate judge didn't talk about it because the magistrate judge created a different test. He used the reasonable water supplier test. It seemed to me mostly had to do with whether the levels in that case were at a certain level. We know the levels are huge. We just don't know, I think we don't, at least I don't know where they are. It's not a level in the well or capture zone issue. It's a different issue. So I'm not sure whether the magistrate just mentioned the capture zone in passing because the magistrate adopted this test from that other case. If that's the right test, fine. I don't know the answer to that. No, it's clearly not the right test for a case in which there is no contamination. The reasonable water provider standard only applies when there is some level of contamination in the wells, and the question is whether it is high enough to generate action. Yes. Why does the reasonable water provider have to wait until there is contamination? If it is apparent to the reasonable water provider that there will be contamination, shouldn't the provider do something about it? Yes, absolutely, ethically, morally, but not in a sense that it would trigger accrual. Okay.  Thank you, Your Honor. Your Honor. May it please the Court. Mark Shorthaw from Side Paget and Rizal for Northrop Grumman, the appellee. I think the Court has hit on a couple of the critical issues. First of all, there are no disputed facts relating to the magistrate, judge, and district court ruling at all. There is no doubt that the Water District here took a myriad number of decisions and steps, ranging from 2007 when they were informed and learned of the first vertical profile boring and high level of VOCs upgrading from Plant 4 through 2008 and 2009. These included declaring a public health emergency, besides obviously designing two treatment systems, claiming and asserting multiple times to the state DEC and the county DOH, Department of Health, that the hotspots would overwhelm their wells immediately. Indeed, at one point in December 2009, they asserted to two agencies that the wells would be overwhelmed by the spring. Now they take the position that there's no injury, despite that confluence of events and their actual implementation of treatment systems, all before the statutory cutoff period, that there's no injury, ergo no claim, because a molecule of contamination, according to them from OU3. If they had sued in 2008, Grumman wouldn't have argued that the claim wasn't ripe? I doubt that, Your Honor. We put ripeness as an answer, but we move for summary judgment on the statute of limitations claim. After all, they asserted to us in multiple communications that they had a claim against Northrop Grumman, that they threatened to sue. We presume, and I presume to this Court, that they made those assertions in good faith because they had an injury. You have statute of limitations, you have the burden of proof. And so you presented not reasonably disputed facts that the contaminants were, as of 2010, in the capture zone. Did you do that? There's no dispute because the engineer for Bethpage Water District, who is authorized to speak for them and spoke loudly and often and with great flourish, asserted on many occasions that not only was the threat immediate, but that the contamination from OU3 was in the capture zone. The district court and the magistrate judge, however, did not need to rely on that because they applied this court's reasonable water district water provider standard, which was not limited to the existence of a contaminant in the well. A water provider who wants to make sure that nobody is poisoned in the future has to start early to get bonding, to do things, when it thinks, you know, it might get to our people. And you think that is accrual. It accrues when there's knowledge of the contamination that is certainly an immediate threat as here, and there's numerous decisions and actions taken on that contamination. It does not follow from that, as amici have argued, that the mere fact of some knowledge of some upgrading contamination at low levels would mean action of this nature, that Bethpage did, would have to be taken. What Bethpage is trying to do is essentially carve out and have the court excuse their dilatory conduct by saying, oh, we don't have a claim. They don't have a claim because they've told this court that perhaps it occurred in 2015 that the contamination hit the well, possibly, and then their general counsel, who wrote for the amicus, said, oh, it's never hit the well. Well, how are they able to sue and recover presumably damages when they never have a claim? I take it by well they mean the tube. I'm sorry? By well they mean the tube? Yes. Okay. The well has a long tube. It's screened. These wells are screened to about 500 feet down. And it hasn't gotten to the well. Under their position, not a molecule of contaminate has entered the well, and therefore, they have no injury. They have no claim. Did it hit the well? Pardon me? Did it hit the well? We believe that the record shows that the OU3 contamination hit the well, and the well is in 4.2. In 2008 and 2009, there were a number of letters that Beth Page's consultants wrote to DEC talking about escalating levels of contaminants in letters that were talking about OU3. There were comments on what's called their remedial investigation report for OU3 and complaining about the model. And if you read those letters in context and carefully and not the way the plaintiff has elipsed paragraphs at a time so it looks like they're different topics, you will see that there is, in fact, contamination in the wells well before the cutoff date. And if you look at Page's figure — Pardon me? Not just the collection area, but the actual wells. That's what my question is. Yes. Did it actually hit wells 4.1? Yes. And the escalating levels of contaminants. And if the appendix at 102.5 has a very nice color picture, which shows the Beth Page well, and if you remember the magistrate judge said it's screened at 550 feet, that the plume from OU3 goes right to where that well is screened. But, as I indicated, there is no bright-line test from the reasonable water supplier case for the reasons several of you have articulated. Under State law, a water dictator is obligated to take action to protect itself. It seems bizarre that it has no claim, if it takes that action, as appropriate and as reasonable until a molecule of contaminant reaches the well. And there are several cases, both state and federal, which have found that the contaminant need not reach the well. Despite the appellant's claim that there is no such case, Judge Seindlin actually made that decision in 2006 relating to the Orange County Water District. There she found that there was contamination in the up-gradient aquifer, that the water district acted reasonably to address it, and, therefore, the claim, the injury, and thus the claim arose at that time. There was not contamination in the well. So it's hard for me to believe that if Judge Seindlin wrote that decision, referred to it favorably in later decisions, that she believed that there was a bright-line test that the reasonable water provider standard only applied when contamination was in the well and, therefore, was triggered by how much is enough to create, to cause action. There's also several state cases, one appellate case to which we've mentioned, the two key span cases in which the court found that if there's contamination in the vicinity of the property, of the well, not in the well in this case, but in the vicinity of the property, either with groundwater contamination or air emissions, that was enough to put a reasonable person on knowledge. If you read the plaintiff's reply brief, they have, it's a revisionist history of those decisions. The decisions are very clear that the contamination was not on the property or in the well and the statute of limitations was triggered. Can I ask you this about the MTBE case from this Court? Is that consistent with New York State law about when the statute of limitations? I think the reasonable water provider standard is more lenient than State law because under the cases I've indicated, the knowledge that there was an immediate threat was sufficient to trigger the statute of limitations. This Court said there should be more than that. There should not only be knowledge, which there clearly was here, but there should be a reasonable water district should have had to act or did act to address the contamination. The Court of Appeals said actual contamination. So I thought it was a more stringent standard. Is that right? The earlier standard was just if there's anything hit, and the 214 backed off that and talked about a three-year statute from when there was a water or any plaintiff knew or should have known about the contamination. Also, the Ginesco case, in there, as here, the water supplier pleaded injury to the groundwater and the wells. In this case, there was a specific allegation there was significant injury to the groundwater that supplies the wells. It didn't say only in the tube in the well. It said the groundwater. That was the same allegation made in Ginesco. And a district court there found the statute of limitation was triggered not by the water in the well, which occurred years later, I'm sorry, the contamination in the well, but by the fact the source of the upgrading contamination was a Superfund site, and that site was listed. That triggered the statute of limitations. There's a number of cases that contravene the Palin's theory that there's no claim until the contaminant is in the well. So finally, I think it's the district court decision and the magistrate judge's decisions were quite clear. They applied this court's standard. They applied it in a common-sense way that allowed Water District to be protected. And finally, there is no per se rule that if a Water District knows there's upgrading contamination, it must sue immediately. That would not serve anyone's public interest. This test protects both parties from spurious lawsuits. Thank you, Your Honor. I just want to know, did you advise Bethpage Water District in 2010 that their groundwater paper well was taking water from was contaminated? Yes. And, for example, in November 2009, the consultants for Northrop Grumman met with consultants and some of the members of Bethpage Water District and showed them that very nice color drawing on page 1025 and said, here's your well, here's the deep plume, your well is screened, as you know, at 550 feet or so. You can see that the well is in the plume, not the hot spot, but the plume. So there's contamination in the well. Thank you. Thank you, Your Honor. Mr. Bonnell. Thank you, Your Honor. The appendix 1695, the neutral party, the DEC, New York State DEC, says just then, March 2013, just a few months before this action was filed, the leading edge of the actionable plume has now reached the wells. It is only until well within the three-year period that there is even a question of fact about whether the actionable plume reached the wells. You mean it reached the wells in the plant? At the plant for which the case is filed. The supplemental appendix pages where they're interpreting the schematics? Well, in that case, is your action limited to damage to the plant? That is an open question. We have not briefed it. We need to think about that, Your Honor. Well, isn't it? Okay. If the harm is only when it gets to the well, then that's a claim, might be a claim about the plant and the water use. But certainly before it gets to the well, there's a claim about the water to be used. Not under the state law. You think state law says you cannot bring a suit until it's in the tube? I am not saying that. I'm saying there may be a disconnect between accrual for statute of limitations purposes and the ability to sue for future injury. And I don't think that's the issue here. The issue here is accrual. And the counsel is entirely incorrect when he, and this is the crux of the matter, when he says that the discovery statute enacted in 1986 backed off the idea that you need contamination, you need actual contact, invasion of the contaminant, that he admits was the case prior to the discovery statute's enactment. And he says the discovery statute backed off that. And now all you need is knowledge about the contaminant. That is not what the law in New York does. And it's this court's eerie responsibility to apply the law the way it's been applied in case after case. The statute talks explicitly about only absorption, contact, ingestion, inhalation, implantation, or injection. There is no accrual under the discovery statute until the property at issue has suffered actual injury under subsection 2, upon or within the property. MTB 9, which was wholly adopted and approved by this court in the 2013 decision, says preventive action plainly does not start the limitations clock, regardless of when one begins to take preventive steps to thwart or mollify an anticipated injury. The question is... We have your argument. Yes. You're way over. We have your argument. Oh, thank you, Your Honor. Yes.